## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE:<br><br>CENTRAL GROCERS, INC., *et al.*,<br><br>    Debtors. | Chapter 7<br><br>Case No. 17-13886<br>(Jointly Administered)<br><br>Hon. Pamela S. Hollis |
| HOWARD B. SAMUELS, solely as chapter 7 trustee of the estates of CENTRAL GROCERS, INC., *et al.*, [1]<br><br>    Plaintiff,<br><br>v.<br><br>SUNSET FOOD MART, INC., and NORTHBROOK SUNSET FOOD MART, INC.,<br><br>    Defendants. | <br><br><br><br><br><br>Adversary No. _____ |

## ORIGINAL COMPLAINT

Howard B. Samuels, solely in his capacity as Chapter 7 trustee for the bankruptcy estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc., and SVT, LLC, pursuant to Federal Rule of Bankruptcy Procedure 7001, hereby brings this adversary proceeding against Defendants Sunset Food Mart, Inc., and Northbrook Sunset Food Mart, Inc., (together, the "Defendants"), and alleges as follows:

## JURISDICTION AND VENUE

1.    This adversary proceeding relates to the above-captioned bankruptcy case (the "Bankruptcy Case"), which was commenced on May 2, 2017 (the "Petition Date") under title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors in these Chapter 7 cases, along with the last four of each debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

1

2.      This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b), as well as Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This matter is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H), and (O).

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4.      The Trustee consents to the entry of a final order or judgment by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution with respect to any of the requests for relief set forth in this Complaint.

## PARTIES

5.      Plaintiff HOWARD B. SAMUELS is the Chapter 7 trustee (the "Trustee") for the bankruptcy estates of Central Grocers, Inc. ("CGI"), Strack and Van Til Super Market, Inc. ("Strack"), and SVT, LLC (together with Strack, "SVT").

6.      Defendant SUNSET FOOD MART, INC. D/B/A LAKE FOREST SUNSET, INC., D/B/A SUNSET FOODS LIBERTYVILLE, INC. ("SUNSET FOOD"), is an Illinois corporation with its principal place of business at 1812 Green Bay Road, Highland Park, IL 60035.  Sunset Food may be served with process through its registered agent, Kenneth Scott Keyes, at 777 Central Ave., Suite 14, Highland Park, IL 60035.

7.      Defendant NORTHBROOK SUNSET FOOD MART, INC. ("SUNSET NORTHBROOK"), is an Illinois corporation with its principal place of business at 1127 Church Road, Northbrook, IL 60062.  Sunset Northbrook may be served with process through its registered agent, William M. Tarpey, Sr., at 777 Central Ave., Unit 4, Highland Park, IL 60035.

8.      Each Defendant is owned and operated by former CGI director John Cortesi ("Director Cortesi").  At all relevant times, Director Cortesi was an acting director of CGI.  For that reason, each Defendant is an insider of CGI and SVT.

2

## **BACKGROUND**

### **A. CGI'S COOPERATIVE PROGRAM**

9.      CGI was a Chicago-based grocery cooperative with hundreds of members that operated grocery stores located in Illinois, Indiana, Iowa, Michigan, and Wisconsin.  Members joined CGI to participate in its purchasing, dividend, equity, and lending programs.

10.      Members were required to maintain "good standing" status to participate in CGI's programs.  The requirements for good standing, along with the other rights and duties of membership, were set out in CGI's membership agreement (the "Membership Agreement"),[2] its Amended and Restated By-Laws (effective November 2012) (the "By-Laws"),[3] the Rules and Regulations (effective March 2013) (the "Rules & Regulations"),[4] its Amended and Restated Articles of Incorporation (as amended 2015) (the "Articles"),[5] and its Member Loan Policy and Procedure (effective January 2010) (the "Loan Policy").[6]  Each member signed the Membership Agreement, thereby agreeing to comply with the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy.

### **1.  The Purchasing Program**

11.      Members in good standing were eligible to participate in CGI's purchasing program.  Members received goods from CGI on account, and CGI received payment through automated clearing house ("ACH") transactions drawn from the member's bank account (the "Purchasing Arrangement").  Members were required to maintain deposit accounts ("Purchase Deposits") with CGI at amounts tied to their weekly buying volume.  *See* Ex. A at 4; Ex. B at 27-28; Ex. C § 5.  If a member failed to maintain an ACH account or failed to maintain appropriate Purchase Deposits, that member was deemed to be in violation of the By-Laws and was no longer in good standing.  *See* Ex. B at 28-29; Ex. C § 3.  A member also lost its good standing status if

---

[2] Defendants' Membership Agreement are attached as Exhibit B.
[3] The By-Laws are attached as Exhibit B.
[4] The Rules & Regulations are as Exhibit C.
[5] The Articles are attached as Exhibit D.
[6] The Loan Policy is attached as Exhibit E.

payment to CGI was not made within the 12-day payment term.  *See* Ex. B at 28-29; Ex. C §§ 3(d), 6.

12.     To terminate purchasing from CGI, members were required to adhere to the procedure outlined in the By-Laws: a member either had to sell or close all its retail locations concurrently with termination or terminate at fiscal year-end and provide 60 days' written notice to CGI (the "Termination Procedure").  *See* Ex. B at 28.  If a member failed to comply with the Termination Procedure or violated any other provision of the By-Laws, that member was no longer in good standing, and that member forfeited any amount otherwise owed by CGI to such member. *See id.* at 25, 28, 29.

### 2.  The Patronage Dividend Program

13.     Members in good standing were also eligible to participate in CGI's patronage dividend program, which was governed by the By-Laws and the Rules & Regulations.  At the close of each fiscal year, CGI's board of directors (the "Board") determined how much of CGI's profit to retain for costs, debt service, and any other reason deemed to be in the best interests of CGI. *See* Ex. B at 25, 27.  The remaining profit, if any, was then distributed to members as a patronage dividend.  If a member failed to maintain good standing or adhere to any provision of the By-Laws, including the Termination Procedure, it forfeited all rights to patronage dividends.  *See* Ex. B at 25, 29.

14.     Members received their share of a patronage dividend either as a distribution of cash, stock, and credit at the end of the fiscal year, or as quarterly cash payments made in advance of the anticipated year-end dividend, with a final distribution of the balance as cash, stock, and credit at the end of the fiscal year.

15.     On or about September 15, 2016, the Board authorized a $44.5 million patronage dividend, subject to final adjustments, for the fiscal year ending July 30, 2016 (the "2016 Patronage Dividend").  None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Patronage Dividend or any portion thereof.  As noted above, the Board had broad discretion under the By-Laws to retain some or all of CGI's profits for costs, debt service, and any

other reason deemed to be in CGI's best interests.  In fact, when the Board authorized the 2016 Patronage Dividend, CGI was insolvent and had been since at least January 2016.[7]

16.    Shortly after authorizing the 2016 Patronage Dividend, the Board learned that CGI had violated the liquidity covenants in its $150 million credit facility.  In turn, CGI's lenders demanded—as a condition for not declaring a default on the credit facility—that CGI defer paying 30% of the 2016 Patronage Dividend until CGI achieved compliance with such liquidity covenants (the "Withheld Dividend").

17.    On or about October 13, 2016, the Board authorized the Withheld Dividend, thereby amending the 2016 Patronage Dividend so that CGI had no obligation to pay the Withheld Dividend until the company was able to make such payment without violating its liquidity covenants.  CGI subsequently sent letters to its members, explaining that the Withheld Dividend had been approved and that 30% of each member's 2016 Patronage Dividend would be recorded solely for bookkeeping purposes in the member's deposit account.  CGI's financial condition never recovered such that it could pay the Withheld Dividend and comply with the liquidity covenants.

### 3.  The Allowance Dividend Program

18.    Members also profited from CGI's participation in allowance programs with its vendors.  CGI entered into contracts with its vendors whereby it would commit to purchase a certain amount of product and in return the vendor would provide CGI a rebate—called an allowance—on its purchases.

19.    On October 27, 2016, while insolvent, CGI paid its members over $2,500,000 in dividends from profit it earned on vendor allowance programs (the "2016 Allowance Dividend").  None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Allowance Dividend.

---

[7] *See infra* Section C.

## B. DEFENDANTS' PARTICIPATION IN
## CGI'S COOPERATIVE PROGRAM

20.     Defendants executed the Membership Agreements, thereby becoming bound by those agreements, the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy. Defendants never resigned their CGI membership prior to the Petition Date.

### 1. Defendants Violated the Termination Procedure

21.     Defendants cancelled their ACH accounts and then terminated purchasing from CGI by April 28, 2017, without adhering to the Termination Procedure.

22.     Defendants' failure to maintain an ACH account and failure to terminate purchasing in accordance with the Termination Procedure constitute material breaches of the Purchasing Arrangement, the Membership Agreement, the By-Laws, and the Rules & Regulations.

23.     Accordingly, Defendants are no longer in good standing with CGI, lost all rights to Patronage Dividends, and forfeited any other amount owed to them by CGI.

### 2. Receipt of Avoidable Transfers

24.     CGI transferred $256,479.38 of the 2016 Patronage Dividend to Defendants (the "Patronage Dividend Transfers") as indicated on the Patronage Dividend Transfer Schedule attached as Exhibit F-1.

25.     CGI transferred $99,901.38 of the 2016 Allowance Dividend to Defendants (the "Allowance Dividend Transfer") as indicated on the Allowance Dividend Transfer Schedule attached as Exhibit F-2.

26.     On March 13, 2019, the Trustee sent demand letters to Defendants (the "Demand Letter"), demanding payment for the Unpaid Receivable, the Patronage Dividend Transfers, and the Allowance Dividend Transfers.[8]  Defendants did not remit payment to the Trustee.

### C. CGI'S INSOLVENCY

27.     CGI was insolvent by August 2016.  Although it did not file for bankruptcy until May 2017, CGI was doomed to fail long before then.  Its financial performance suffered dramatically throughout 2016 and 2017, largely driven by SVT's challenges.  As SVT struggled, it purchased less, and, because it was CGI's primary customer, CGI's cash flow declined.  In addition, reduced purchases from SVT caused CGI's overall purchase volume to shrink enough to reduce its margins and affect the Members' patronage rebate.  This effect, in turn, made CGI less attractive to customers and potential customers.

28.     Even after CGI recognized a $67 million in impairments at the end of fiscal 2016, its balance sheet still overstated the company's financial condition.  CGI had significant contingent liabilities that reduced the true value of the company.  These liabilities included approximately $95 million in unfunded pension withdrawal liability.  CGI also overvalued certain assets.  The 2016 year-end balance sheet valued its distribution center at $70 million.  It sold for just $61 million in July 2017.  In addition, CGI valued its interest in SVT at $94 million, but SVT's EBITDA was plummeting.  SVT was also saddled with pension fund liabilities.  Given the CGI Appointees' refusal to sell SVT untethered to a long-term purchasing contract, by August 2016 CGI should have valued its interest in SVT at something close to zero, not $94 million.  Moreover, CGI and SVT were highly leveraged yet had thin operating margins, making them especially vulnerable to downturns in their businesses.

---

[8] The Demand Letter is attached as Exhibit G.

29.     After the CGI Board approved the September 2016 patronage rebate, CGI's lenders expressed "great concern as to the direction of the Company."  If CGI paid the dividend, it would violate its liquidity covenants, so the banks required CGI to hold back 30% of the rebate.  CGI never recovered enough to pay the deferred amount.

30.     Finally, the CGI bankruptcy has resulted in massive losses for CGI's secured and unsecured creditors.  The CGI estate faces unpaid creditor claims of approximately $361,800,000, and it will only ever be able to pay back a small fraction of this amount.  CGI filed for bankruptcy in May 2017.  There were no major unforeseen events impacting the value of CGI between July 31, 2016 (the close of CGI's fiscal year) and the time it filed bankruptcy.

## CAUSES OF ACTION

### COUNT ONE
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – 2016 Patronage Dividend
### (Against All Defendants)

31.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

32.     On or within two years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

33.     The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

34.     CGI incurred this obligation for the benefit of the Defendants.

35.     CGI received less than reasonably equivalent value in exchange for incurring this obligation.

36.     CGI was insolvent at the time of or as a result of incurring this obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI incurred this obligation.

37.     Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT TWO
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Patronage Dividend Transfers
### (Against All Defendants)

38.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

39.     On or within two years before the Petition Date, CGI transferred the Patronage Dividend Transfers to the Defendants.

40.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

41.     The Patronage Dividend Transfers were made to or for the benefit of the Defendants.

42.     CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

43.     CGI was insolvent at the time of or as a result of the Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Patronage Dividend Transfers.

44.     Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT THREE
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – 2016 Patronage Dividend
### (Against All Defendants)

45.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

46.     On or within four years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

47.     The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

48.     CGI incurred this obligation for the benefit of the Defendants.

49.     CGI received less than reasonably equivalent value in exchange for incurring this obligation.

50.     CGI was insolvent at the time of or as a result of incurring this obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the 2016 Patronage Dividend.

51.     Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

## COUNT FOUR
## Avoidance of Fraudulent Transfers
## Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Patronage Dividend Transfers
## (Against All Defendants)

52.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

53.     On or within four years before the Petition Date, CGI transferred the Patronage Dividend Transfers to the Defendants.

54.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

55.     The Patronage Dividend Transfers were made to or for the benefit of the Defendants.

56.     CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

57.     CGI was insolvent at the time of or as a result of Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or

believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Patronage Dividend Transfers.

58.     Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**COUNT FIVE**
**Avoidance of Preferential Transfers**
**Pursuant to 11 U.S.C. § 547(b) – Patronage Dividend Transfers**
**(Against All Defendants)**

59.     Pleading in the alternative to Counts One through Four, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

60.     Defendants are insiders of CGI and SVT.

61.     Within one year before the Petition Date, CGI made the Patronage Dividend Transfers, or caused such transfers to be made, to Defendants.

62.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

63.     The Patronage Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

64.     The Patronage Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

65.     CGI was insolvent when the Patronage Dividend Transfers were made.

66.     The Patronage Dividend Transfers enabled Defendants to receive more than they would have received if: (a) such transfers had not been made; and (b) Defendants had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

67.     Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 547(b).

**COUNT SIX**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(a) – Patronage Dividend Transfers**
**(Against All Defendants)**

68.     Pleading in the alternative to Counts One through Four, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

69.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

70.     CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

71.     The Patronage Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

72.     The Patronage Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

73.     CGI was insolvent when the Patronage Dividend Transfers were made.

74.     Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(a).

**COUNT SEVEN**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(b) – Patronage Dividend Transfers**
**(Against All Defendants)**

75.     Pleading in the alternative to Counts One through Four, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

76.     Defendants are insiders of CGI and SVT.

77.     CGI made the Patronage Dividend Transfers, or caused such transfers to be made, to Defendants.

78.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

79.     The Patronage Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

80.     The Patronage Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

81.     CGI was insolvent when the Patronage Dividend Transfers were made.

82.     The Defendants had reasonable cause to believe that CGI was insolvent at the time of Patronage Dividend Transfers.

83.     Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(b).

**COUNT EIGHT**
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers**
**(Against All Defendants)**

84.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

85.     CGI had no obligation to make the Allowance Dividend Transfers.

86.     If, however, CGI had an obligation to make the Allowance Dividend Transfers, that obligation was incurred on or within two years before the Petition Date.

87.     If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of the Defendants.

88.     If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

89.     If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

13

90.     Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT NINE**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers**
**(Against All Defendants)**

91.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

92.     On or within two years before the Petition Date, CGI made the Allowance Dividend Transfers to the Defendants.

93.     The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

94.     The Allowance Dividend Transfers were made to or for the benefit of the Defendants.

95.     CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

96.     CGI was insolvent at the time of or as a result of the Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Allowance Dividend Transfers.

97.     Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT TEN**
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers**
**(Against All Defendants)**

98.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

99.     CGI had no obligation to make the Allowance Dividend Transfers.

14

100.    If, however, CGI incurred an obligation to make the Allowance Dividend Transfers, that obligation was incurred within four years before the Petition Date.

101.    If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of the Defendants.

102.    If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

103.    If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

104.    Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**COUNT ELEVEN**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers**
**(Against All Defendants)**

105.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

106.    On or within four years before the Petition Date, CGI made the Allowance Dividend Transfers to the Defendants.

107.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

108.    The Allowance Dividend Transfers were made to or for the benefit of the Defendants.

109.    CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

110.    CGI was insolvent at the time of or as a result of Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Allowance Dividend Transfers.

111.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

### COUNT TWELVE
### Avoidance of Preferential Transfers
### Pursuant to 11 U.S.C. § 547(b) – Allowance Dividend Transfers
### (Against All Defendants)

112.    Pleading in the alternative to Counts Eight through Eleven, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

113.    Defendants are insiders of CGI and SVT.

114.    Within one year before the Petition Date, CGI made the Allowance Dividend Transfers, or caused such transfers to be made, to Defendants.

115.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

116.    The Allowance Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

117.    The Allowance Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

118.    CGI was insolvent when the Allowance Dividend Transfers were made.

119.    The Allowance Dividend Transfers enabled Defendants to receive more than they would have received if: (a) such transfers had not been made; and (b) Defendants had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

120.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 547(b).

**COUNT THIRTEEN**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(a) – Allowance Dividend Transfers**
**(Against All Defendants)**

121.    Pleading in the alternative to Counts Eight through Eleven, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

122.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

123.    CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

124.    The Allowance Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

125.    The Allowance Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

126.    CGI was insolvent when the Allowance Deposit Transfers were made.

127.    Accordingly, the Trustee seeks to avoid the Allowance Deposit Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(a).

**COUNT FOURTEEN**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(b) – Allowance Dividend Transfers**
**(Against All Defendants)**

128.    Pleading in the alternative to Counts Eight through Eleven, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

17

129.    Defendants are insiders of CGI and SVT.

130.    CGI made the Allowance Dividend Transfers, or caused such transfers to be made, to Defendants.

131.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

132.    The Allowance Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

133.    The Allowance Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

134.    CGI was insolvent when the Allowance Dividend Transfers were made.

135.    The Defendants had reasonable cause to believe that CGI was insolvent at the time of Allowance Dividend Transfers.

136.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(b).


**COUNT FIFTEEN**
**Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**
**(Against All Defendants)**

137.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 136.

138.    The Patronage Dividend Transfers and the Allowance Dividend Transfers are subject to avoidance pursuant to 11 U.S.C. §§ 544(b), 547(b), and 548(a)(1)(B).

139.    The Defendants received the Patronage Dividend Transfers and the Allowance Dividend Transfers as the initial transferees.

140.    Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trustee seeks to recover the value of the Patronage Dividend Transfer and the Allowance Dividend Transfers from the Defendants.

## COUNT SIXTEEN
### Unjust Enrichment
### (Against All Defendants)

141.     Pleading in the alternative to Counts One through Fifteen, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

142.     Defendants received benefits—at CGI's expense—in connection with the Purchasing Arrangement, the Loan Documents, and certain avoidable transfers.   Specifically, Defendants received benefits associated with the Patronage Dividend Transfers and the Allowance Dividend Transfers.

143.     Defendants have unjustly retained these benefits to CGI's detriment, even though the Trustee has attempted to recover these benefits through the Demand Letter.

144.     Retention of these benefits by Defendants violates fundamental principles of justice, equity, and good conscience.

145.     Accordingly, the Trustee seeks to recover the amount by which Defendants have been unjustly enriched.

## COUNT SEVENTEEN
### Disallowance of Claims Pursuant to 11 U.S.C. § 502
### (Against All Defendants)

146.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 145.

147.     This count is asserted against Defendants to the extent that any claims have been filed by or scheduled on behalf of Defendants against CGI's bankruptcy estate (the "CGI Estate").

148.     Defendants are persons or entities from which property is recoverable under 11 U.S.C. §§ 542 and 550 (the "Recoverable Property").

149.     Defendants have not turned over the Recoverable Property to the CGI Estate.

150.     Accordingly, pursuant to 11 U.S.C. § 502(d), the Trustee hereby objects to and seeks disallowance of any claims by Defendants against the CGI Estate.  Moreover, pursuant to 11 U.S.C. § 502(j), the Trustee seeks reconsideration and disallowance of any claims by Defendants against the CGI Estate to the extent that such claims have been allowed by this Court.

## CONDITIONS PRECEDENT

151.    All conditions precedent to the Trustee's claims for relief have been performed or have occurred.

## PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against the Defendants as follows:

a.    avoiding the 2016 Patronage Dividend obligation;

b.    avoiding the Patronage Dividend Transfers and directing that the value of the Patronage Dividend Transfers be paid to the Trustee;

c.    avoiding any obligation to make the Allowance Dividend Transfers;

d.    avoiding the Allowance Dividend Transfers and directing that the value of the Allowance Dividend Transfers be paid to the Trustee;

e.    awarding recovery of unjust benefits and disgorgement of all ill-gotten gains;

f.    disallowing any claims filed by or scheduled on behalf of Defendants against the CGI Estate;

g.    reconsidering and disallowing any claims filed by or scheduled on behalf of Defendants against the CGI Estate;

h.    awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

i.    awarding reasonable attorney's fees and expenses, together with all costs of court; and

j.    granting such other and further relief, at law or equity, as this Court deems just and proper.

Dated: November 19, 2019                    Respectfully submitted,

                                            */s/ Leo B. Oppenheimer*
                                            Eric D. Madden (admitted *pro hac vice*)
                                            J. Benjamin King (admitted *pro hac vice*)

20

Leo B. Oppenheimer (admitted *pro hac vice*)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, TX 75201
(214) 420-8900 (T)
(214) 420-8909 (F)
emadden@rctlegal.com
bking@rctlegal.com
loppenheimer@rctlegal.com

*Special Litigation Counsel to*
*Howard B. Samuels, Chapter 7 Trustee for the*
*Estates of Central Grocers, Inc., Strack and*
*Van Til Super Market, Inc., and SVT, LLC*

-and-

Michael M. Eidelman
William W. Thorsness
Allison B. Hudson
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 (T)
(312) 609-5005 (F)
meidelman@vedderprice.com
wthorsness@vederprice.com
ahudson@vedderprice.com

*Counsel to Howard B. Samuels, Chapter 7*
*Trustee for the Estates of Central Grocers,*
*Inc., Strack and Van Til Super Market, Inc.,*
*and SVT, LLC*